## McLAUGHLIN v. MEANS et al.

No. 7492—Opinion Filed May 9, 1916.

Rehearing Denied Dec. 26, 1916.

(161 Pac. 812.)

**Brokers Right to Compensation—Performance of Contract.**

Where, pursuant to a contract providing that the second parties should furnish, secure, and deliver to the first party oil and gas leases covering an area of 3,500 acres in a designated locality, and that the first party should bear and pay all expense incident and necessary to the approval by the county court of leases on lands owned by minors, the second parties secured the proper execution of such leases and the approval thereof by the county court, and the same were transmitted to the first party through a bank, with draft attached for the expense, in the way of a reasonable attorney's fee incurred in procuring such approval, held, that there was a substantial compliance with the terms of said contract by the second parties.

(Syllabus by Bleakmore, C.)

Error from District Court, Hughes County; John Caruthers, Judge.

Action by B. H. McLaughlin against C. M. Means and others. Judgment for defendants, and plaintiff brings error. Affirmed.

H. B. Martin, A. F. Moss, and R. K. Dumbell, for plaintiff in error.

J. F. McKeel, and W. T. Anglin, for defendants in error.

Opinion by BLEAKMORE, C. This is an appeal from the district court of Hughes county. The parties appear and are referred to here as in the trial court. Plaintiff and four of the defendants entered into the following contract:

"This agreement, made and entered into in triplicate this 4th day of March, 1913, by and between C. M. Means, W. W. Barnett, T. W. Bell, and M.' B. Donaghey, of Allen, Oklahoma, parties of the first part, and B. H. McLaughlin, of Tulsa, Oklahoma, party of the second part, witnesseth: That whereas, parties of the first part are the owners in fee of about three thousand acres of land, more or less, in the south half of township five north, range nine east, Hughes county, Oklahoma, on which said land there is at this time no lease for oil and gas mining purposes; and whereas, parties of the first part are in position to have can and are able to secure oil and gas mining leases on about fifteen hundred acres of land in the immediate vicinity of the land owned by said first parties, in order that leases thereon may be blocked practically solid; and whereas, first parties desire to have said leases and lands developed for oil and gas; and whereas, second party desires to do said development provided suitable acreage can be secured;

"Now, therefore, for and in consideration of one dollar and the terms, agreements, stipulations, and conditions hereinafter set forth, it is agreed between the parties hereto as follows: Parties of the first part hereby agree to furnish, secure, and deliver in one block, as nearly as practicable, leases for oil and gas mining purposes in, on, to, and covering thirty-five hundred acres of land, all to be located in the south half of said township five north, range nine east, the title to which said leases shall be merchantable and acceptable to attorney of second party. Parties of the first part further agree to furnish, secure, and deliver to second party said leases, on the form hereto attached, on or before March 24, 1913, and second parties shall have ten days thereafter to accept or reject the title to same. · Should any·title be found, upon examination, not merchantable or acceptable to second party, first parties shall have twelve days thereafter to cure the defects therein, and if such defects are incurable, or if the title thereto cannot be perfected to the satisfaction of second party, then the first parties are to secure, furnish, and deliver to the second party leases covering a like amount of acreage to be located in the south half of said township five north, range nine east, in lieu of the amount covered by the leases the title to which is rejected, to complete the amount of acreage agreed to be delivered, to wit, thirty-five hundred acres. The party of the second part agrees to commence operations to drill one well for oil or gas without cost or expense to the first parties at some location on the said leases, to be furnished, secured, and delivered as herein agreed, within ninety days from the 15th of April, 1913, and continue the drilling thereof with due diligence, and complete the same within nine months from the date of the commencement of said operations, or this agreement to be void. · Should first parties fail, refuse, or neglect to furnish, secure, and deliver the full amount of acreage herein stipulated, this agreement shall be null and void and of no effect, at the option of the second party.

"Party of the second part has this day deposited in escrow in the First National Bank of Allen, Oklahoma, together with a copy of this' agreement, the sum of five hundred dollars, conditioned as follows: That in the event the first parties comply with all the terms and conditions of this agreement and secure, furnish, and deliver said leases to the second party, and the second party refuses, neglects, or fails to comply with his part of this agreement, then and in that event this agreement, and all the leases hereby agreed to be secured, furnished, and delivered, shall be void and of no effect, and the said five hundred dollars this day deposited, as above set forth, shall be forfeited to the first parties. That in the event the first parties shall fail, refuse, or neglect to comply with the terms and conditions of this agreement, then the said sum so deposited by the second party in escrow, as above set forth, shall be returned and delivered by said bank to the second party; or, upon compliance with this agreement,

the said sum so deposited by the second party in escrow, shall be returned to him by said bank, within ten days from the date of commencement of operations to drill said well. All expenses incident and necessary to the approval by the county court of any leases on land owned by minors that may be secured is to be borne and paid by second party. It is further agreed that second party is to furnish all take-offs on said land at his own expense. It is agreed that leases on all the land covered by the list hereto attached shall be furnished and delivered by first parties to the second party, as a part of the leases herein agreed to be furnished, secured, and delivered.

"In witness whereof, the parties hereto have hereunto set their hands this 4th day of March, 1913.

> "C. M. Means
> "W. W. Barnett,
> "T. W. Bell,
> "M. B. Donaghey,
> "First Parties

> "B. H. McLaughlin,
> "Second Party."

On December 15, 1913, plaintiff commenced this action, alleging performance of said contract on his part as far as possible; that the defendants, parties to said agreement, prior to and including March 31, 1913, had procured the execution of certain oil and gas leases pursuant thereto, embracing 2,312.57 acres, which were accepted by him as a partial compliance therewith; that said defendants had failed and refused to furnish and deliver leases covering the remaining portion of 3,500 acres, as provided by the contract; that, notwithstanding the delay in the execution and delivery thereof, he has at all times been ready, willing, and able to accept all such leases, and to proceed with the drilling of a well in accordance with his agreement; that defendants had set up a claim that plaintiff had failed to comply with the terms of the contract on his part, by reason of which his rights in the leases theretofore executed had been forfeited, and that defendants had repudiated said contract and leases, and were attempting to again lease the lands covered thereby to other persons, and that the $500 deposited by plaintiff in the First National Bank of Allen had been wrongfully withdrawn therefrom; that subsequent to the execution of said contract, as the result of the exploration of others, oil and gas in large and profitable quantities had been discovered in proximity to the lands involved; and that the oil and gas rights under said contract had greatly increased in value, being worth more than $50,000. There was prayer that all of the defendants be permanently enjoined from interfering with plaintiff in the use of the lands for oil and gas mining pur-

poses, and from executing other leases covering the same, and that the defendants who were parties to the contract be required to perform same by executing and delivering to plaintiff leases covering additional lands sufficient to embrace in the aggregate 3,500 acres, or, if said defendants were unable to furnish, secure and deliver such leases, that plaintiff have judgment against them in the sum of $50,000, and a further prayer for judgment against said defendants and the bank for the $500 deposit.

Simmons, Thomas, and Holmes were made parties defendant upon motion of the other defendants, on the ground that they were jointly interested with plaintiff in the transactions involved. Defendants answered, asserting that plaintiff had breached the contract, by reason of which they had been damaged in the sum of more than $80,000. The cause was submitted to the court and a jury, resulting in verdict and judgment for defendants in the sum of $500, the amount deposited in the bank.

It appears from the evidence that, in addition to the leases which were delivered to and accepted by plaintiff, the defendants, who were parties to the contract above set forth, procured to be executed to defendants certain oil and gas leases by guardians, on the lands of their minor wards, duly approved by the proper county court, all of which leases covered in the aggregate approximately 3,500 acres of land. Some of these leases were transmitted to plaintiff by the attorney for the guardian, through a bank, with draft attached for his fee for services. Plaintiff refused to pay such draft and accept the leases. It is contended by plaintiff that the maximum acreage embraced by all the leases, including those of the guardians, procured by said defendants at any time to be executed to him, was at least 28 acres less than the 3,500 acres provided for in the contract; while defendants assert that the total acreage covered by all the leases executed to plaintiff included some 3,512.57 acres. The evidence in this regard is somewhat conflicting.

Plaintiff wrote the following letter to the defendant bank:

"Oil Exchange Drug Co. 120 South Main Street. Phone 1045. Tulsa, Okla., 7—22—13. First National Bank, Allen, Okla.—Gentlemen: You are hereby notified to at once return to me the $500 deposited by me in your bank as per agreement with C. M. Means et al. and myself under date of March 4, 1913, as the parties of the first part have failed to comply with their part of the contract. as said contract provides said leases shall be delivered on or before March 24, 1913, and

said contract further provides that, if first parties refuse to comply therewith, this contract shall be null and void at my option; and I hereby exercise my option, and in case you fail to return said money, I shall at once proceed in an action at law to recover same, and will look to you for same. Yours very truly, B. H. McLaughlin."

With reference to this he testified:

"Q. Mr. McLaughlin, after you had been down there, you and Mr. Thomas and Mr. Holmes, in the first part of June, and found that the Gerty well had shut down, you decided a little bit after that that you would exercise your option to revoke this entire contract, didn't you? A. Yes, sir. Q. And you did exercise it by writing a letter to the First National Bank of Allen? A. Yes, sir. Q. Revoking and refusing to live up to the contract? A. Yes, sir. Q. You wrote this letter of revocation on the 22d day of June, 1913, did you not? A. Yes, sir."

Plaintiff in his brief states:

"The 3,500 acres to be composed of leases on certain lands, which lands belonged to minors, and the contract provided that the plaintiff in error would pay all incidental and necessary expense in obtaining the approval of the county court for the making of the leases to the plaintiff in error. These minor leases covered about 1,000 acres, and were known and spoken of in the testimony as the Bell and Barnett leases. These leases were made, the court approved them, and they were sent, with draft attached, not only for the actual court costs, but the draft also covered a sum for attorney's fees. The plaintiff in error declined to accept the draft and pay it, and consequently the leases were never in his hands. The reason that the plaintiff in error did not pay the draft was, in the first place, because he contended that it was not his duty under the contract to pay counsel fees, as that matter had been discussed prior to the execution of the contract, and, in the second place, under the terms of the written contract between the parties to this litigation, the plaintiff in error had the right to the delivery of leases for the purpose of having the title thereto examined, and for this purpose the contract allowed him ten days from the date of the delivery of the leases. The question as to whether the record conclusively shows the shortage of acreage is the only question which the plaintiff in error desires to bring before this court, as it is contended that it was error to refuse motion for new trial. The question as to proper admission and rejection of testimony is waived by this plaintiff in error, and also the question as to whether the time limited to March 24, 1913, was of the essence of the contract is waived, as this plaintiff in error has at all times been ready and willing to comply with the terms of his agreement."

It is admitted that defendants had complied with the contract to the extent of furnishing and delivering leases covering at least 2,500 acres; but it is insisted that they failed to perform as to the remainder, for the reason that there was no such delivery of the minor leases as contemplated by the agreement. The contract provides that:

"All expense incident and necessary to the approval by the county court of any leases on land owned by minors that may be secured is to be borne and paid by the second party."

Plaintiff, according to his own statement, refused to pay the draft and accept leases on 1,000 acres of land owned by minors, on the theory (1) that he was not bound by the terms of his contract to pay for the services of an attorney in securing the approval of such leases by the county court; (2) that by virtue of the provisions of the contract he was allowed ten days after delivery of such leases to him within which to examine the title; and (3) the transmission of such leases under the circumstances did not constitute a delivery thereof.

It is not claimed that the attorney's fee was not a legitimate part of the expense actually incurred as an incident to the approval of the leases, or that such fee was excessive. Clearly, under the terms of the agreement, defendants were not chargeable with such expense, while, if plaintiff's theory is correct, they must be held primarily liable therefor. Again, there is no suggestion that, even under the attendant circumstances, plaintiff was denied the privilege of examining such leases, or that the lessors' title was in any way defective. It may be conceded that there was no technical delivery of the minor leases, but it is obvious that such leases were secured by defendants, who put it within the power of plaintiff to receive and have them examined upon payment of a certain expense incurred in procuring the approval thereof by the county court, which expense, under the provisions of the contract, was properly chargeable to no one else. We are of the opinion that there was a substantial compliance with the terms of the contract on the part of defendants.

Subsequent to his refusal to pay the draft and accept the minor leases (upon inspection of the premises with his associates, and after learning that work upon an oil and gas well in the vicinity had been suspended), plaintiff by his letter to the bank sought to relieve himself of liability under the contract, and specifically declared that he refused to be further bound thereby; and then, some five months later, when, as he alleges, other parties by their explorations had established the value of the lands in question

for oil and gas mining purposes, he brought this suit.

Apropos of plaintiff's apparent attitude in · this case, we quote the language employed by Justice Miller in Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 331:

"The fluctuating character and value of this class of property is remarkably illustrated in the history of the production of mineral oil from wells. Property worth thousands today is worth nothing tomorrow; and that which would today sell for a thousand dollars as its fair value may, by the natural changes of a week, or the energy and courage of desperate enterprise, in the same time be made to yield that much every day. The injustice, therefore, is obvious, of permitting one holding the right to assert an ownership in such property to voluntarily await the event, and then decide, when the danger, which is over, has been at the risk of another, to come in and share the profit."

We find no error in the proceedings, prejudicial to the substantial rights of plaintiff, and the judgment should therefore be affirmed.

By the Court: It is so ordered.